FILED
2016 Mar-03  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BROOKLINE SPECIAL SITUATIONS FUND, LLC; MAC, LLC,** )<br><br>**Plaintiffs,** )<br><br>**v.** )<br><br>**CUP FOOD YOU PICK UP, LLC; CUPLEMENT MANAGEMENT, LLC; BRYAN DEGRAW, SR.; PAULETTE DEGRAW;** )<br><br>**Defendants.** ) | **CASE NO.: _____** |

## COMPLAINT

Plaintiffs Brookline Special Situations Fund, LLC ("BSSF") and MAC, LLC ("MAC") (BSSF and MAC together, "Plaintiffs") file this Complaint against Defendants CUP FOOD YOU PICK UP, LLC ("CUP"), Cuplement Management, LLC ("Cuplement"), Bryan DeGraw, Sr. ("Bryan"), and Paulette DeGraw ("Paulette") (collectively "Defendants"). In support of this Complaint, Plaintiffs state as follows:

### I.   PARTIES

1.     Plaintiff Brookline Special Situations Fund, LLC ("BSSF") is a Delaware limited liability company registered to do business in Jefferson County,

Alabama.  BSSF lent $100,000 to CUP in exchange for two convertible promissory notes.

2.    Plaintiff MAC, LLC ("MAC") is an Alabama limited liability company with its principal place of business in Birmingham, Alabama.  MAC lent $25,000 to CUP in exchange for a convertible promissory note.

3.    CUP FOOD YOU PICK UP, LLC ("CUP") is a Florida limited liability company formed and existing in Walton County, Florida.

4.    Cuplement Management, LLC ("Cuplement") is a Florida limited liability company formed and existing in Walton County, Florida.  Cuplement is the managing member of CUP.

5.    Bryan DeGraw, Sr. ("Bryan") is an individual adult resident of the State of Florida and the managing member of Cuplement.

6.    Paulette DeGraw ("Paulette") is an individual adult resident of the State of Florida and a member of CUP and/or Cuplement.  Paulette is married to Bryan (Paulette and Bryan together the "DeGraws").  At all relevant times, the DeGraws have owned and/or otherwise controlled and participated in the management of CUP and Cuplement.

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between Plaintiffs and

Defendants and because the amount in controversy in this lawsuit exceeds $75,000, exclusive of interest and costs.  Furthermore, Plaintiffs bring this action under "Rule 10b-5," in accordance with the federal Securities Exchange Act of 1934 and related federal regulations.

8.     Venue is proper in this district under 28 U.S.C. § 1391(a)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

### III.     FACTUAL ALLEGATIONS

9.     CUP was formed on March 21, 2013.  CUP is no longer in operation. When CUP was in operation, it was a food-service business[1] located in Walton County, Florida, with one "flagship" store front location and one kiosk.

10.     In the summer of 2014, CUP was looking to raise capital from investors and potentially to expand its operations into Alabama and/or Georgia.

11.     On September 14, 2014, CUP and Brookline Group[2] executed a Placement Agency Agreement (the "PAA"), whereby Brookline Group agreed to act

---

[1] The concept of CUP's business was that it would prepare and sell "reasonably priced healthy meals options for people on the go packaged in cups (each, a 'CUP') without compromising cost, health or convenience."

[2] Brookline Group, LLC ("Brookline Group") is an Alabama limited liability company and is a Securities and Exchange Commission-registered broker/dealer focusing on financing emerging growth companies through debt and equity capitalization.

as the exclusive placement agent for CUP's private offering of securities until May 15, 2015 (the "Offering Period").

12.     In its role as placement agent to CUP, Brookline Group agreed to use "best efforts" during the Offering Period to attempt to find accredited investors to invest up to $500,000 in CUP in return for Convertible Promissory Notes (the "Notes").

13.     As part of its "best efforts," Brookline Group was required to provide potential investors with a note purchase agreement, disclosure schedules, CUP's business plans, a form of a convertible promissory note, and other documents (the "Offering Documents") that were approved, finalized, and based on information provided by CUP.  CUP's Offering Documents were supposed to provide a full, complete, and accurate disclosure of all material facts and factors related to CUP that a potential investor would want or need to know.

14.     The Offering Documents contained, among other things, the Note Purchase Agreement ("Note Purchase Agreement"), which included CUP's Disclosure Schedule ("Company Disclosure Schedule").  A true and correct copy of the Note Purchase Agreement is attached as Exhibit A.  A true and correct copy of the Company Disclosure Schedule is attached as Exhibit B.

15.     CUP's Disclosure Schedule included a summary description of the offering, a description of the business of CUP, CUP's material contracts, risk factors

associated with an investment in CUP, and other pertinent information relevant to

CUP's offering of Notes in exchange for up to $500,000 in financing.

16.    The Note Purchase Agreement and Disclosure Schedule are dated

November 25, 2014.

17.    In the Note Purchase Agreement and Disclosure Schedule, CUP

represented and warranted to investors (called "Subscribers") that, among other

things:

(a)    CUP's unaudited financial information included in the Company
Disclosure Schedule "fairly present[ed] in all material respects the
financial condition and position of [CUP] at the dates and for the
periods indicated." Ex. A, at 9, ¶ 2.9.

(b)    Since the date of the Company Disclosure Schedule (November 25,
2014), "there has been no change in the business, operations, conditions
(financial or otherwise), prospects, assets or results of operations of
Company that could reasonably be expected to have a Material Adverse
Effect."[3] Ex. A, at 10, ¶ 2.13.

(c)    "The information set forth in the Offering Materials as of [November
25, 2014] contains no untrue statement of a material fact nor omits to
state a material fact necessary in order to make the statements contained
therein, in light of the circumstances under which they are made, not
misleading." Ex. A, at 10, ¶ 2.14.

(d)    "The Company serves breakfast, lunch and dinner." Ex. B at
Attachment 2 ("Business of the Company").

(e)    "The Company currently has two locations, the original store in Redfish
Village (the "Flagship Store")…and a 400 square foot retail/kiosk in
Seacrest Village, next to Rosemary Beach, Florida.  The Flagship Store

---

[3] "Material Adverse Effect" is defined as "a material adverse effect on the
business, operations, conditions (financial or otherwise), properties, assets or
results of operations of [CUP]."  Ex. A, at 8, ¶  2.1.

is in a 2400 square foot space where the product is prepared each day and sold there and at the retail/kiosk in Seacrest Village." Ex. B at Attachment 2 ("Business of the Company").

(f)  "The founders have continued to put additional funds into the business as it proceeds to break even." Ex. B at Attachment 2 ("Business of the Company").

(g)  "The Company's distribution platform is based on a 'hub and spoke' system. The Company's Flagship Store functions as a centralized prep kitchen that supplies it and the Company's kiosk locations with product. The Company plans to enter each new market on establishing a central 'prep' kitchen to prepare the food and then deliver the products to several distribution outlets both Company and non-company retail locations…." Ex. B at Attachment 2 ("Business of the Company").

(h)  "The Company's Flagship Store current market area is South Walton/Highway 30A in Northwest Florida…. The Company plans to expand in the Highway 30A with the addition of two more retail/kiosk locations, one in Panama City Beach at the Pier Park retail center…and in Destin near Plantation Commons…. All three retail/kiosks will be within a 30 minute commute from the prep kitchen in the Flagship Store." Ex. B at Attachment 2 ("Business of the Company").

(i)  "The Company has selected Birmingham, Alabama as its first metropolitan market. Birmingham's proximity to the Company's Flagship Store provides a level of brand awareness." Ex. B at Attachment 2 ("Business of the Company").

(j)  "The Company has a total of six employees between the two locations. Paulette DeGraw is the day to day manager of the business and splits her time between both locations. There is an experienced restaurant manager overseeing the Flagship Store and part time employees manning the Seacrest kiosk." Ex. B at Attachment 2 ("Business of the Company").

(k)  The Company was operating under a "team of advisors who provide key strategic, tactical advice and counsel to principles [sic] of the Company," including "Kelley and Debbie Mossburg – veteran entrepreneurs and restaurant owners who recently successfully launched one of the hottest fast casual concepts in the business, Chicken Salad Chick, the Mossburgs will be advising the business on all areas

such as business planning, strategy, site selection, marketing, sales, operations, and budgeting….” Ex. B at Attachment 2 (“Business of the Company”).

(l)    The move into Birmingham was an “expansion” into a “second market”—an “additional location.” Ex. B at Attachment 2 (“Business of the Company”); Attachment 8 (“Risk Factors”).

(m)    CUP’s only “material contracts” were the following:

- PPA with Brookline Group, LLC, dated September 14, 2014;

- Equipment Finance Agreement with Kingswood Leasing, Inc., dated September 30, 2014; and

- Lease Agreement for Flagship Store in Redfish Village.

Ex. B. at Attachment 7.

Each of these was a material fact or factor.

18.    CUP failed ever to amend, revise, or update the Note Purchase Agreement or Disclosure Schedule.  CUP thus omitted, concealed, or otherwise failed to disclose to potential Subscribers that, among other things:

(a)    The DeGraws were unable or otherwise had decided not to contribute any additional capital to CUP.

(b)    The DeGraws were unwilling to sign a personal guaranty for any necessary lease agreements for store locations.

(c)    Without a fully successful fundraising, CUP had zero capital and would immediately go out of business.

(d)    CUP was unable to pay its November rent in Florida without an emergency short-term loan.

(e)    The Mossburgs were not active advisors of CUP and had no apparent involvement in CUP.

    (f)    CUP, Cuplement, and/or the DeGraws had agreed or planned to agree to partner with a man named Vance Fulkerson to take over his failing "Yogurt Lab" business at an exorbitant cost to CUP.

    (g)    CUP, Cuplement, and/or the DeGraws had agreed or planned to agree to give Vance Fulkerson a control or veto position within CUP's management.

    (h)    CUP had no real plan or ability to expand in Florida.

    (i)    CUP had failed or was on the cusp of failing in Florida.

    (j)    CUP had shut down or would shortly shut down all Florida operations—meaning that it no longer had any operations at all.

    (k)    CUP's move into Birmingham would not be an "expansion" of a viable business but rather an attempted re-start of a failed business.

Each of these was a material fact or factor, deceptively and intentionally or recklessly omitted from Defendants' disclosures.

19.    While Plaintiffs became generally aware of a few of these material omissions, they had no knowledge and were provided no disclosure of several others. Most notably, at the time of making Plaintiffs' investments in CUP, Plaintiffs had no knowledge and were provided no disclosure of the facts that (a) Defendants had entered into an Asset Purchase Agreement with Vance Fulkerson whereby they would purchase Yogurt Lab's used furniture and equipment (which had *de minimis* liquidation value) for $170,000; (b) Defendants had agreed to give Vance Fulkerson a fifty percent (50%) interest in Cuplement, effectively giving him management control over CUP; and (c) CUP had no "team of advisors," and, in fact, the

Mossburgs had never advised or even agreed to advise CUP. Had these facts been disclosed to Plaintiffs, Plaintiffs would not have invested.

20.     Furthermore, at the time of Plaintiffs' investments in CUP, Defendants specifically represented to Plaintiffs that CUP only needed $150,000 to complete and begin operating the Birmingham "hub" location. Allowing for the normal 10% "retainage" during the construction process, this meant that substantial completion of the hub could be achieved for $135,000. Defendants represented that CUP had a construction schedule, that the "build out" would only take five weeks, and that the "hub" would be completed and ready for business by early February, 2015. In reliance on these representations and the omissions discussed above, Plaintiffs agreed to and did invest $125,000. Coupled with $8,000 already provided by another investor, this meant that CUP was provided with $133,000—only $2,000 short of the amount needed to achieve substantial completion of the hub. While CUP accepted the money, it failed to do anything with it. No apparent construction work was performed. The hub was never completed (or even started). Defendants took the money and never did a constructive thing with it. Defendants have failed to account for any of the money they received.

21.     On or about December 5, 2014, Plaintiff BSSF invested $50,000 in CUP in exchange for a convertible promissory note labeled as "Note Number 001."

This investment was made in reliance on Defendants' intentional or reckless material representations and omissions.

22.    On or about January 16, 2015, Plaintiff BSSF invested $50,000 in CUP in exchange for a convertible promissory note labeled as "Note Number 002." This investment was made in reliance on Defendants' intentional or reckless material representations and omissions.

23.    On or about January 16, 2015, Plaintiff MAC invested $25,000 in CUP in exchange for a convertible promissory note labeled as "Note Number 003." This investment was made in reliance on Defendants' intentional or reckless material representations and omissions.

24.    CUP closed its operations in or around December, 2014. CUP has not been "open for business" since that time. It has not had a kitchen, a store front, or made or sold any meals. It has had zero revenue. It has no ability to pay its debts, including the Notes.

25.    Plaintiffs have been damaged by the loss of their $125,000 total investment in CUP.

## Count One

### Securities Fraud – Note Number 001

26.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if set forth fully herein.

27.    Plaintiff BSSF's purchase of Note Number 001 was the purchase of a security from CUP.

28.    Defendants deceptively and intentionally or recklessly omitted from Defendants' disclosures and/or misrepresented all of the material facts described in Paragraphs 18-20 hereinabove.

29.    Plaintiff relied on Defendants' omissions and misrepresentations in purchasing Note Number 001 for $50,000 and has thereby been caused damage in the principal amount of $50,000.

WHEREFORE, PREMISES CONSIDERED, Plaintiff BSSF demands judgment in its favor against all Defendants for such damages as the court and trier of fact may award, plus interest, costs, and attorney fees.

## Count Two

### Securities Fraud – Note Number 002

30.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if set forth fully herein.

31.    Plaintiff BSSF's purchase of Note Number 002 was the purchase of a security from CUP.

32.    Defendants deceptively and intentionally or recklessly omitted from Defendants' disclosures and/or misrepresented all of the material facts described in Paragraphs 18-20 hereinabove.

33.     Plaintiff relied on Defendants' omissions and/or misrepresentations in purchasing Note Number 002 for $50,000 and has thereby been caused damage in the principal amount of $50,000.

WHEREFORE, PREMISES CONSIDERED, Plaintiff BSSF demands judgment in its favor against all Defendants for such damages as the court and trier of fact may award, plus interest, costs, and attorney fees.

## Count Three

## Securities Fraud – Note Number 003

34.     Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if set forth fully herein.

35.     Plaintiff MAC's purchase of Note Number 003 was the purchase of a security from CUP.

36.     Defendants deceptively and intentionally or recklessly omitted from Defendants' disclosures and/or misrepresented all of the material facts described in Paragraphs 18-20 hereinabove.

37.     Plaintiff relied on Defendants' omissions and/or misrepresentations in purchasing Note Number 003 for $25,000 and has thereby been caused damage in the principal amount of $25,000.

WHEREFORE, PREMISES CONSIDERED, Plaintiff MAC demands judgment in its favor against all Defendants for such damages as the court and trier of fact may award, plus interest, costs, and attorney fees.

Count Four

Securities Fraud – Control Person Liability

35.    Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if set forth fully herein.

36.    At all relevant times, Cuplement and the DeGraws were the "control persons" for CUP.

37.    Cuplement and the DeGraws directly and culpably participated in the fraudulent conduct made the basis of this action.

38.    In accordance with Section 20(a) of the Exchange Act, Cuplement and the DeGraws are jointly and severally liable with CUP for the fraudulent conduct made the basis of this action.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment in their favor against all Defendants, jointly and severally, for such damages as the court and trier of fact may award, plus interest, costs, and attorney fees.

Respectfully submitted this the 3rd day of March, 2016.

**Plaintiffs demand trial by struck jury on all Counts of this Complaint.**

Gregory A. Brockwell (ASB-9949-r49b)
*Attorney for Plaintiffs Brookline Special
Situations Fund, LLC and MAC, LLC*

**OF COUNSEL:**

LEITMAN, SIEGAL & PAYNE, P.C.
420 20th Street North, Suite 2000
Birmingham, AL 35203
Telephone:  (205) 251-5900
Facsimile:  (205) 986-5071
E-Mail:      gbrockwell@lsppc.com

## REQUEST FOR SERVICE BY PRIVATE PROCESS SERVER

**To the Clerk of Court:**

**Plaintiffs intend to serve Defendants by private process server, as follows:**

**CUP Food You Pick Up, LLC
c/o Registered Agent Bryan DeGraw
174 Watercolor Way, Suite 103
Santa Rosa Beach, FL 32459**

**Cuplement Management, LLC
c/o Registered Agent Bryan DeGraw
174 Watercolor Way, Suite 103
Santa Rosa Beach, FL 32459**

**Bryan DeGraw, Sr.
310 Seacrest Drive
Panama City Beach, FL 32413**

**Paulette DeGraw
310 Seacrest Drive
Panama City Beach, FL 32413**